No. 25-11347

In the

# United States Court of Appeals
## for the Eleventh Circuit

Coalition for Good Governance, et al.,
*Plaintiff-Appellants*,

v.

Secretary of State for the State of Georgia, et al.,
*Defendant-Appellees*.

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:21-cv-02070 — J. P. Boulee, *Judge*

## BRIEF OF DEFENDANT-APPELLEES

Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Attys. General*


Clark Hill PLC
3630 Peachtree Rd. NE
Suite 550
Atlanta, GA 30326
(678) 370-4377
btyson@clarkhill.com

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Elijah J. O'Kelley
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for Defendant-Appellees*

*Coalition for Good Governance v. Secretary*, No. 25-11347

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Bartolomucci, H. Christopher, Counsel for Defendant-Appellees

Boulee, J.P., District Judge

Brown, Bruce, Counsel for Plaintiff-Appellants

Bruce P. Brown Law LLC, Counsel for Plaintiff-Appellants

Carver, William Bradley, Sr., Counsel for Defendant-Intervenors

Clark Hill PLC, Counsel for Defendant-Appellees

Clyde, Thomas MacIver, Counsel for Amicus Georgia First Amendment Foundation

Coalition for Good Governance, Plaintiff-Appellant

Consovoy McCarthy PLLC, Counsel for Defendant-Intervenors

Dasgupta, Riddhi, Former Counsel for Defendant-Appellees

Dickey, Gilbert, Counsel for Defendant-Intervenors

Drennon, Baxter, Counsel for Defendant-Intervenors

Duffey, Jr., William S., Former Defendant

Dufort, Jeanne, Plaintiff-Appellant

Evans, James C., Counsel for Defendant-Intervenors

Field, Brian, Counsel for Defendant-Appellees

*Coalition for Good Governance v. Secretary*, No. 25-11347

Friedman, Bradley, Plaintiff-Appellant

Georgia Advancing Progress Political Action Committee, Plaintiff-Appellant

Georgia First Amendment Foundation, Amicus

Ghazal, Sara Tindall, Defendant-Appellee

Giacoma Roberts & Daughdrill LLC, Counsel for Plaintiff-Appellants

Graham, Ryan, Plaintiff-Appellant

Green, Tyler R., Counsel for Defendant-Intervenors

Hall Booth Smith PC, Counsel for Defendant-Intervenor

Hall, John E., Counsel for Defendant-Intervenors

Hecht, Gregory, Former Counsel for Plaintiff-Appellants

Hecht Walker PC, Former Counsel for Plaintiff-Appellants

Hetzel, Jeffrey, Counsel for Defendant-Intervenors

Ichter Davis LLC, Counsel for Plaintiff-Appellants

Ichter, Cary, Counsel for Plaintiff-Appellants

Jackson County Democratic Committee, Plaintiff-Appellant

Jacoutot, Bryan F., Counsel for Defendant-Appellees

Johnston, Janice, Defendant-Appellee

Kaufman, Alex, Counsel for Defendant-Intervenors

Kemp, Brian, Defendant-Appellee

*Coalition for Good Governance v. Secretary*, No. 25-11347

Kilpatrick Townsend & Stockton, LLP, Counsel for Amicus

Kucharz, Kevin, Counsel for Defendant-Intervenors

Lang, Antwan, Plaintiff-Appellant

LaRoss, Diane Festin, Counsel for Defendant-Appellees

Le, Anh, Former Defendant

Lindsey, Edward, Defendant-Appellee

Martin, Rhonda, Plaintiff-Appellant

Mashburn, Matthew, Defendant-Appellee

McCarthy, Thomas, Counsel for Defendant-Intervenor

McGowan, Charlene, Former Counsel for Defendant-Appellees

McNichols, Judy, Plaintiff-Appellant

Nakamura, Aileen, Plaintiff-Appellant

National Republican Congressional Committee, Defendant-Intervenor

National Republican Senatorial Committee, Defendant-Intervenor

Norris, Cameron T., Counsel for Defendant-Intervenor

O'Kelley, Elijah, J., Counsel for Defendant-Appellees

Paradise, Loree Anne, Former Counsel for Defendant-Appellees

Petrany, Stephen, J., Counsel for Defendant-Appellees

Pullar, Patricia, Plaintiff-Appellant

Raffensperger, Brad, Defendant-Appellee

*Coalition for Good Governance v. Secretary*, No. 25-11347

Republican National Committee, Defendant-Intervenor

Roberts, Shea, Counsel for Plaintiff-Appellants

Schaerr, Gene, Counsel for Defendant-Appellees

Schaerr Jaffe LLP, Counsel for Defendant-Appellees

Shirely, Adam, Plaintiff-Appellant

Sullivan, Rebecca, Former Defendant

Thomas-Clark, Ernestine, Plaintiff-Appellant

Throop, Elizabeth, Plaintiff-Appellant

Tyson, Bryan, Counsel for Defendant-Appellees

Vaughan, Elizabeth, Former Counsel for Defendant-Appellees

Weigel, Daniel, Former Counsel for Defendant-Appellees

White, Dowdy W., Counsel for Defendant-Intervenor

Woodfin, Conor D., Counsel for Defendant-Intervenor

Worley, David, Former Defendant

No publicly traded company or corporation has an interest in the outcome of this appeal.

/s/ *Elijah J. O'Kelley*
Elijah J. O'Kelley

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellees do not request oral argument in this case. Plaintiff-Appellants' claimed injuries are so speculative that they plainly lack standing, and the decisional process would not be aided by oral argument.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ............................................... i

Table of Authorities ............................................................... iv

Statement of Issues .................................................................. 1

Introduction ........................................................................... 2

Statement of the Case .............................................................. 6

    A. Statutory Background ...................................................... 6

        1. Suspension Rule ..................................................... 6

        2. Observation Rule .................................................... 9

        3. Tally Rules ........................................................... 10

        4. Communication Rule ............................................. 10

        5. Photography Rule .................................................. 11

    B. Proceedings Below .......................................................... 11

    C. Standard of Review ......................................................... 16

Summary of Argument .......................................................... 16

Argument .............................................................................. 21

    I. No Plaintiff has standing to challenge the Suspension Rule. ................................................................................. 23

        A. The Suspension Rule is not subject to a pre-enforcement challenge. ................................................. 24

        B. Plaintiffs do not intend to engage in constitutionally protected conduct that is arguably proscribed by the Suspension Rule. ......................................................... 28

# TABLE OF CONTENTS
## (continued)

C. The possibility of the Suspension Rule being enforced against Plaintiffs is utterly speculative......................... 31

II. No Plaintiff has standing to challenge the various election rules................................................................................ 44

A. Plaintiffs' speculative fears of unlikely prosecution do not establish an injury. ................................................ 44

    1. Observation Rule. .................................................... 45

    2. Tally Rules. ............................................................. 47

    3. Communication Rule. ............................................. 49

    4. Photography Rule. .................................................. 51

B. Plaintiffs cannot show traceability or redressability. .. 53

III. There is no organizational standing.................................. 59

Conclusion........................................................................ 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

\*_Bankshot Billiards, Inc. v. City of Ocala,_
    634 F.3d 1340 (11th Cir. 2011) .....................................17, 24, 29

_Bochese v. Town of Ponce Inlet,_
    405 F.3d 964 (11th Cir. 2005) ..............................................55, 56

_Bowen v. First Fam. Fin. Servs., Inc.,_
    233 F.3d 1331 (11th Cir. 2000) ............................................ 5, 43

_Chavez v. Sec'y Fla. Dep't of Corr.,_
    647 F.3d 1057 (11th Cir. 2011) ................................................. 39

_City of S. Miami v. Governor,_
    65 F.4th 631 (11th Cir. 2023).......................21, 22, 31, 41, 57, 59

_Clapper v. Amnesty International USA,_
    568 U.S. 398 (2013)
        ...................................................... 3, 17, 22, 31–34, 36, 40, 44, 45

\*_Club Madonna, Inc. v. City of Miami Beach,_
    924 F.3d 1370 (11th Cir. 2019)
        ............................................................. 19, 40, 44, 46–48, 50, 51

_Corbett v. Transp. Sec. Admin.,_
    930 F.3d 1225 (11th Cir. 2019) ................................32, 44, 50, 59

_Davis v. Fed. Election Comm'n,_
    554 U.S. 724 (2008) ................................................................. 21

_Dream Defs. v. Gov. of the State of Fla.,_
    57 F.4th 879 (11th Cir. 2023)................................................... 16

_Ga. Latino All. for Hum. Rts. v. Governor of Ga.,_
    691 F.3d 1250 (11th Cir. 2012) ................................................ 42

*GeorgiaCarry.Org, Inc. v. Georgia,*
    687 F.3d 1244 (11th Cir. 2012)
        .....................................................................4, 16, 25–28

*Jacobson v. Fla. Sec'y of State,*
    974 F.3d 1236 (11th Cir. 2020) ................................................. 58

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................... 22

*Matsumoto v. Labrador,*
    122 F.4th 787 (9th Cir. 2024)..................................................... 58

*Nat'l Shooting Sports Found. v. Att'y Gen. of New
    Jersey,*
    80 F.4th 215 (3d Cir. 2023) ..............................................3, 36, 39

*\*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ..........................................................36, 37

*PDVSA US Litig. Tr. v. LukOil Pan Americas LLC,*
    65 F.4th 556 (11th Cir. 2023)..................................................... 45

*Sapuppo v. Allstate Floridian Ins. Co.,*
    739 F.3d 678 (11th Cir. 2014) ..............................................34, 54

*Steffel v. Thompson,*
    415 U.S. 452 (1974) .................................................................... 24

*Support Working Animals, Inc. v. Governor of Fla.,*
    8 F.4th 1198 (11th Cir. 2021)................................................54, 55

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)
        .......................................... 3, 17, 22, 24, 25, 28–32, 41, 42, 44, 46

*Swann v. Sec'y, Ga.,*
    668 F.3d 1285 (11th Cir. 2012) ................................................. 53

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) ...................................................... 56

*Walters v. Fast AC, LLC*,
   60 F.4th 642 (11th Cir. 2023)
   ................................................... 20–22, 35, 38, 39, 52, 53, 55, 56

*Williams v. Bd. of Regents*,
   629 F.2d 993 (5th Cir. 1980) ...................................................... 29

*Wollschlaeger v. Governor, Fla.*,
   848 F.3d 1293 (11th Cir. 2017) (en banc) ................................... 4

*Wooden v. Bd. of Regents of Univ. Sys. of Ga.*,
   247 F.3d 1262 (11th Cir. 2001) ................................................. 39

*Younger v. Harris*,
   401 U.S. 37 (1971) .................................................... 18, 19, 47, 48

**Statutes**

28 U.S.C. § 2201 ...................................................................... 13

42 U.S.C. § 1983 ...................................................................... 12

O.C.G.A. § 15-18-6 .................................................................. 54

O.C.G.A. § 16-15-4 .................................................................. 54

O.C.G.A. § 21-2-31 .................................................................. 54

O.C.G.A. § 21-2-33.2
   ....................................................... 2, 6–8, 26–28, 32, 33, 35, 42

O.C.G.A. § 21-2-106 ......................................................7, 9, 26, 33

O.C.G.A. § 21-2-107 ................................................................. 33

O.C.G.A. § 21-2-386 ......................................... 2, 3, 10, 11, 19, 47–50

O.C.G.A. § 21-2-413 ...............................................................11, 52

O.C.G.A. § 21-2-568 ........................................................................ 10

O.C.G.A. § 21-2-568.1 .............................................................2, 9, 45

O.C.G.A. § 21-2-568.2 ...........................................................2, 11, 51

O.C.G.A. § 45-15-3 ........................................................................ 54

## STATEMENT OF ISSUES

1.    Plaintiffs challenge a law that allows the Georgia State Election Board to suspend local election officials for unremedied election law violations or election mismanagement, after the Board conducts a series of proceedings.  Do Plaintiffs have standing to pursue a pre-enforcement challenge when the law has never been applied to them or anyone else, when it is speculative that it ever will be applied to them, when they do not claim an intention to commit unremedied election law violations or to mismanage elections, and when they do not argue that the conduct authorizing suspension is constitutionally protected?

2.    Plaintiffs challenge the criminalization of intentionally observing another person's vote, tallying absentee ballots before polls close, communicating certain information about absentee ballots before polls close, and photographing voted or in-process ballots.  Do Plaintiffs have standing to pursue a pre-enforcement challenge when they do not intend to engage in much of that conduct, when their fears of criminal prosecution are based on speculative, untenable, and never-before-seen applications of the law, and when they have not sued any government official responsible for criminal prosecution?

## INTRODUCTION

A plaintiff's hallucination that he may someday be prosecuted under outlandish interpretations of a statute is not sufficient to establish standing. A plaintiff certainly lacks standing when he does not even intend to engage in the conduct he (baselessly) fears will be prosecuted. And speculative fears of criminal prosecution are not a basis for suing government officials who are not criminal prosecutors. Yet that's what Plaintiff-Appellants rely on in this case. The district court was correct to rule that they lack standing, and this Court should affirm.

In response to a variety of election problems, Georgia enacted Senate Bill 202 in 2021. Among a variety of other provisions is the Suspension Rule. It authorizes the State Election Board, under strict procedures, to temporarily suspend local election officials who commit repeated and unremedied election law violations or severely mismanage multiple elections. O.C.G.A. § 21-2-33.2(c). Separately, SB 202 criminalizes intentionally observing who someone is voting for and taking pictures or other recordings of ballots that have been or are being voted. O.C.G.A. §§ 21-2-568.1, 568.2. It also establishes procedures for election officials to process absentee ballots before the polls close, including procedures for allowing people to monitor that process. O.C.G.A.

§ 21-2-386(a)(2)(A).  But the law prohibits those monitors from tallying the ballots or communicating to non-election officials about "any ballot, vote, or selection."  O.C.G.A. § 21-2-386(B)(vi)–(vii).

Plaintiffs' challenges to all these provisions are meritless, but they face an antecedent problem.  None of the provisions have been enforced against any Plaintiff—several have never been enforced against anyone.  "Pre-enforcement challenges are unusual" and "the exception rather than the rule."  *Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80 F.4th 215, 223 (3d Cir. 2023) (quotation omitted).  They are not meant for claims based on the "highly speculative fear" that a statute will be enforced, or for claims reliant "on a highly attenuated chain of possibilities."  *Clapper v. Amnesty International USA,* 568 U.S. 398, 410 (2013).  They require "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "the threat of future enforcement … is substantial."  *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159, 164 (2014) (quotation omitted).

Put another way, pre-enforcement challenges are for when "the plaintiff is seriously interested in disobeying, and the defendant seriously intent on enforcing the challenged measure."

3

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1252 (11th Cir. 2012) (quotation omitted). They are for plaintiffs "who are looking down the barrel of [a] disciplinary gun, [but] are not required to guess whether the chamber is loaded." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1306 (11th Cir. 2017) (en banc).

Plaintiffs are not looking down the barrel of any metaphorical gun. Plaintiffs do not claim an intention to actually engage in conduct arguably proscribed by almost any of the relevant provisions of SB 202, *see, e.g.*, Doc. 120 at 32, nor would much of that conduct even be arguably constitutionally protected: repeatedly violating election laws, for example, or intentionally observing someone's ballot, or disclosing vote tallies before the polls close. Plaintiffs instead fear someone, somewhere, *might* invoke the Suspension Rule out of "pettiness" or "irritati[on]," Doc. 121 at 32, 44, despite that not being a basis for suspension and despite nobody having ever petitioned the Board for suspension. They fear some criminal prosecutor might prosecute them for walking past a polling place with a large window or for "attempting to think," Doc. 104 at 135, 140, despite no such prosecution ever happening, despite themselves having voted in person after SB 202 without incident, *e.g.*, Doc. 129 at 79–80, and

despite there being no reason to believe in such absurdity. Those are just a few examples.

To be perfectly, overwhelmingly, undeniably clear: *None* of Plaintiffs' fears have ever happened. Not to them. *E.g.*, Doc. 120 at 48; Doc. 121 at 45–46. Not to anyone. *E.g.*, Doc. 123-3 at 10; Doc. 135 at 18, 20.

Plus, despite their complaint challenging SB 202's *criminalization* of certain conduct, *e.g.*, Doc. 104 at 12–13, and despite their complaint claiming their injury is the "threat of criminal prosecution," *id.* at 92, and despite their deposition testimony revealing concerns about criminal prosecution, *e.g.*, Doc. 120 at 37; Doc. 122 at 44; Doc. 126 at 35–37, Plaintiffs have not sued anyone responsible for criminal prosecution. Their injury is thus not traceable to Defendants, nor would enjoining Defendants from civilly enforcing SB 202 do anything to redress Plaintiffs' supposed injuries.

"There is at most a 'perhaps' or 'maybe' chance that [SB 202] will be enforced against these plaintiffs in the future, and that is not enough to give them standing to challenge its enforceability." *Bowen v. First Fam. Fin. Servs., Inc.*, 233 F.3d 1331, 1340 (11th Cir. 2000). This Court should affirm.

5

## STATEMENT OF THE CASE

Plaintiff-Appellants sued Defendant-Appellees the Governor of Georgia, the Secretary of State of Georgia, and members of Georgia's State Election Board, challenging the constitutionality of certain aspects of SB 202.  Doc. 104.  The district court granted summary judgment to Defendants on the basis that Plaintiffs lacked standing to assert their claims, and it dismissed Plaintiffs' claims without prejudice.  Doc. 162.

### A.  Statutory Background

In 2021, the Georgia legislature enacted Senate Bill 202.  It included a vast array of election reforms, a few of which are at issue in this litigation.

#### 1.  Suspension Rule

SB 202 authorizes the State Election Board to suspend local election officials in two circumstances.  O.C.G.A. § 21-2-33.2(c).  The first basis for suspension is that a local election official committed at least three violations of election laws in the last two general election cycles and "has not sufficiently remedied the violations."  *Id.*  The second basis is that the local election official "for at least two elections within a two-year period, demonstrated nonfeasance, malfeasance, or gross negligence in the administration of the elections."  *Id.*

6

The procedures for initiating an investigation and ultimately suspending a local official are extensive. The Board may initiate suspension proceedings "on its own motion or following a recommendation based on an investigation by a performance review board." *Id.* § 21-2-33.2(a). Alternatively, the "governing authority of a county or municipality … may petition" the Board to "pursue" suspension proceedings, but only "following a recommendation based on an investigation by a performance review board pursuant to [O.C.G.A. §] 21-2-106." *Id.* The prerequisite performance review board investigation can be requested by only the "governing authority of the same jurisdiction as the local election official" or by a certain number of state representatives and senators who represent the relevant county. *Id.* § 21-2-106(a)(1)–(3).

"Upon receiving a petition" or initiating proceedings on its own motion, the Board "shall conduct a preliminary investigation to determine if sufficient cause exists to proceed to a full hearing on the petition." O.C.G.A. § 21-2-33.2(b). The Board's preliminary investigation "shall be followed by a preliminary hearing." *Id.* At that preliminary hearing, the Board "shall determine if sufficient cause exists to proceed to a full hearing on the petition or if the petition should be dismissed." *Id.* The Board is directed to

7

"promulgate rules and regulations for conducting such preliminary investigation and preliminary hearing," *id.*, but has not yet published those rules, Doc. 157 at 6.

After the preliminary hearing, the Board "may suspend a county or municipal superintendent … if at least three members of the board find, after notice and hearing," one of the two bases for suspension.  O.C.G.A. § 21-2-33.2(c)(1)–(2).  The Board is also authorized to appoint a qualified temporary superintendent to serve in place of the suspended official.  *Id.* § 21-2-33.2(e)(1).

Suspended officials can petition for reinstatement, at which point the Board is required to "conduct a hearing for the purpose of receiving evidence relative to whether the [official's] continued service … is more likely than not to improve the ability of the jurisdiction to conduct elections in a manner that complies with" Georgia law.  *Id.* § 21-2-33.2(f).  The suspended official "shall be given at least 30 days' notice prior to such hearing and such hearing shall be held no later than 90 days after the petition is filed."  *Id.*  If the Board denies the petition, the denial is treated as a final agency decision under Georgia's Administrative Procedure Act, and it is judicially reviewable.  *Id.*

The Board has never received a petition to "pursue" Suspension Rule proceedings, nor has it ever done so on its own

motion, nor has it ever suspended anyone, nor are there any pending proceedings, nor does the Board have any plans to initiate proceedings. Doc. 123-3 at 4. Instead, the only activity adjacent to the Suspension Rule involved a performance review board investigation of Fulton County, *id.*, which arose under O.C.G.A. § 21-2-106. The request for that investigation was made by members of the Georgia General Assembly who represent Fulton County. Doc. 123-3 at 16. The performance review board observed several elections in Fulton County and interviewed staff and members of the Fulton County Board of Elections. *Id.* at 17–18. Despite finding many areas for concern, the performance review board found that Fulton County had made improvements (thanks in large part to the very existence of the performance review), and it did not recommend suspension. *Id.* at 29–30.[1]

### 2.  Observation Rule

Except for authorized voting assistance and authorized children, SB 202 makes it a felony to "intentionally observe an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting." O.C.G.A. § 21-2-568.1. Prior to SB 202, it had already been a felony to

---

[1] Plaintiffs do not challenge the legality of performance review board investigations. Doc. 135 at 17–18.

induce an elector to show how he voted or to disclose how someone voted without his consent. *See* O.C.G.A. § 21-2-568(a)(3)–(4).

### 3. Tally Rules

SB 202 establishes procedures for election officials to begin scanning, without tallying, absentee ballots before the polls close. O.C.G.A. § 21-2-386(a)(2)(A). It provides that "no person shall tally, tabulate, estimate, or attempt to tally, tabulate, or estimate or cause the ballot scanner or any other equipment to produce any tally or tabulate, partial or otherwise, of the absentee ballots cast until the time for the closing of the polls." *Id.* Additionally, people may observe the process, but while "viewing or monitoring the process" they are "prohibited from … [t]allying, tabulating, estimating, or attempting to tally, tabulate, or estimate, whether partial or otherwise, any of the votes on the absentee ballots cast." O.C.G.A. § 21-2-386(a)(2)(B)(vi). The Tally Rules have not been enforced against anyone. Doc. 135 at 20.

### 4. Communication Rule

Related to the process for scanning absentee ballots before the polls close, SB 202 also prohibits "monitors and observers" of the process from "[c]ommunicating any information that they see while monitoring the processing and scanning of the absentee ballots, whether intentionally or inadvertently, about any ballot,

vote, or selection to anyone other than an election official who needs such information to lawfully carry out his or her official duties." O.C.G.A. § 21-2-386(a)(2)(B)(vii).

### 5. Photography Rule

SB 202 makes it a misdemeanor "for any person to use photographic or other electronic monitoring or recording devices, cameras, or cellular telephones" to either "[p]hotograph or record the face of an electronic ballot marker while a ballot is being voted or while an elector's votes are displayed on such electronic ballot marker" or to "[p]hotograph or record a voted ballot." O.C.G.A. § 21-2-568.2. Before SB 202, Georgia law had already prohibited taking pictures inside a polling place and photographing the face of a voting machine while a ballot was displayed. O.C.G.A. § 21-2-413(e). SB 202 added a specific misdemeanor penalty while also clarifying the prohibited conduct and expanding it beyond just the inside of the polling place.

### B. Proceedings Below

**1.** In May 2021, Plaintiffs—a collection of non-profit organizations, local election officials, voters, and a journalist—filed suit to challenge each of these provisions. Doc. 1; Doc. 104 at 13. Their complaint included a broad swath of claims regarding the various rules at issue.

11

Plaintiffs raise three claims challenging the Suspension Rule. Doc. 104 at 120–30. First, the Board Member Plaintiffs (Plaintiffs who are on county-level boards of elections) challenge the Suspension Rule as a violation of the Due Process Clause for allegedly not providing enough pre- and post-deprivation process *if* they are ever suspended. *Id.* at 120–22. Second, Plaintiffs also claim the rule violates certain provisions of the Georgia Constitution (a claim they purport to assert under 42 U.S.C. § 1983, not any state law cause of action). *Id.* at 123–28. Third, Plaintiffs claim the Suspension Rule burdens the substantive due process right to vote because they say it could result in the Board suspending local election officials without replacing them, leaving nobody to count absentee ballots. *Id.* at 128–30.

Plaintiffs likewise assert three challenges to the Observation Rule. *Id.* at 130–37. First, Plaintiffs claim the rule violates the substantive due process right to vote because they allege it is "frequently not possible to vote in person without appearing to commit this felony" due to the layout of many polling places and the allegedly large size of voting machines screens. *Id.* at 130–34. Second, Plaintiffs allege the rule is void for vagueness because "it potentially criminalizes … mere entry into a polling place" where voting machine screens are visible. *Id.* at 134–35. Third,

Plaintiffs allege the rule amounts to unlawful voter intimidation under 28 U.S.C. § 2201 because it "can be invoked to selectively criminalize mere entry into a polling place or even approaching a polling place with large windows." *Id.* at 135–37.

Plaintiffs assert two claims against the Tally Rules. *Id.* at 139, 144. First, they claim the rules are void for vagueness because they "criminalize[] the act of thinking about or attempting to think about a tally or tabulation, without the requirement of any external manifestation or communication of such thoughts." *Id.* at 139–41. Second, Plaintiffs claim the Tally Rules violate the First Amendment by criminalizing the allegedly protected expression of recording and communicating vote tallies. *Id.* at 144–46.

Plaintiffs raise only one claim against the Communication Rule, arguing it violates the First Amendment by criminalizing the communication of "*any* information about absentee ballot processing or scanning," not just information about the vote tally itself. *Id.* at 137–39. They do not challenge any prohibition on disclosing information about vote tallies. *Id.* at 138.

Finally, Plaintiffs included two claims against the Photography Rule. *Id.* at 141–44. First, they claim it criminalizes protected speech and violates the First Amendment because

13

photographing "election officials counting ballots" and "voters in the act of voting" has been part of election press coverage for a long time. *Id.* at 141–42. Second, they claim the Photography Rule is void for vagueness. *Id.* at 142–44.

**2.** Plaintiffs initially sought a preliminary injunction regarding 2021 elections, Doc. 15, which the district court denied, Doc. 37. Defendants later moved to dismiss, Doc. 41, but the district court denied that motion, accepting without question Plaintiffs' claims about fears of prosecution and changed behavior based on it, Doc. 50. Despite many extensions of the time in which to conduct discovery, *see* Doc. 67, 83, 84, 96, 102, 105, Plaintiffs never did so. They instead amended their complaint for a second time. *See* Doc. 104. Defendants, meanwhile, deposed various Plaintiffs (the only discovery conducted in the case) and then moved for summary judgment. Doc. 123. They argued that Plaintiffs lack standing to assert their claims and cannot succeed on the merits anyway. *Id.*

The district court agreed as to standing and granted summary judgment on that basis. Doc. 162. As to the Suspension Rule, the court ruled that no plaintiff had standing to challenge it because none faced a certainly impending injury. *Id.* at 15–18. The court reasoned that for any plaintiff to be suspended requires

14

a highly attenuated chain of events including the plaintiff committing multiple election law violations over a multi-year period, a petition to the Board, a preliminary investigation, and a preliminary hearing, plus more. *Id.* at 15–16. On top of that, the court pointed out that the undisputed evidence was that the Suspension Rule has only come up in relation to Fulton County— not any Plaintiff—and that there are no plans to enforce the rule against any Plaintiff. *Id.* at 16–17.

As to the claims challenging various other SB 202 provisions, the district court concluded that Plaintiffs could not satisfy the traceability and redressability requirements for standing. *Id.* at 19–27. The court noted that although Plaintiffs challenge the alleged criminalization of certain conduct, no Defendant is a state official responsible for criminal enforcement. *Id.* at 24. The Governor's general enforcement power bears no meaningful relationship to SB 202's enforcement, *id.* at 21–24, and the Board has no role in the potential criminal proceedings Plaintiffs' complaint challenged, *id.* at 27 n.12. Based on that, the court concluded Plaintiffs could not establish that enjoining Defendants would do anything to redress their supposed injury of being subject to potential criminal proceedings. *Id.* at 27.

## C.  Standard of Review

This Court reviews "standing determinations *de novo*." *Dream Defs. v. Gov. of the State of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023) (quotation omitted).

## SUMMARY OF ARGUMENT

**I.** Plaintiffs' attempt to challenge the Suspension Rule before it has ever been enforced runs into at least three dispositive problems.

First, the rule is not susceptible to a pre-enforcement challenge.  Although pre-enforcement challenges can be viable when a Plaintiff "is seriously interested in disobeying, and the defendant seriously intent on enforcing the challenged measure," *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1252 (quotation omitted), that's not the situation.  The Suspension Rule prohibits no conduct at all—certainly no conduct Plaintiffs are interested in disobeying.  Also, Plaintiffs challenge the adequacy of the Suspension Rule's procedures, but those procedures have never been applied.  That means there is nothing to even assess the constitutional adequacy of.

Second, even if the pre-enforcement challenge framework did apply, it would only undermine Plaintiffs' standing claims. Plaintiffs have not claimed "an intention to engage in," any

16

conduct that might result in suspension or even the initiation of suspension proceedings, *Driehaus*, 574 U.S. at 159 (quotation omitted); namely, violate election laws without remedying the violations or continually mismanage elections. But even if they did intend to do those things, that conduct is not even arguably constitutionally protected, which is alone a reason to reject standing. *See Bankshot Billiards, Inc. v. City of Ocala,* 634 F.3d 1340, 1350 (11th Cir. 2011).

Third, without intent to do anything that would actually trigger the Suspension Rule, Plaintiffs argue that they might be suspended for, really, no reason. *See, e.g.*, Doc. 104 at 97; Doc. 121 at 44–45. But that is a quintessential "highly speculative fear" that does not support standing. *Clapper*, 586 U.S. at 410. Refutation is hardly necessary, but the mechanics of the Suspension Rule show how outlandish Plaintiffs' position is. It can be invoked only by a local governing authority or the Board, making it "restricted to state officials who are constrained by explicit guidelines or ethical obligations." *Driehaus*, 573 U.S. at 164. That *undermines* pre-enforcement standing. *See id.* And suspension can happen for only two limited reasons—meaning any proceeding will necessarily be based on suspicion of and investigation into those things. If that weren't obvious enough,

17

the record puts Plaintiffs' position out to pasture.  The Board has never received a petition for suspension proceedings, nor has it initiated them on its own motion, and the only time a county was investigated to *potentially* be recommended for suspension, the investigation recommended *against* it.  Doc. 123-3 at 29–30.

Plus, Plaintiffs first alleged four years ago that they would— any minute now—be suspended for no good reason.  *See, e.g.*, Doc. 1 at 70.  They have not been.

**II.A.**  Plaintiffs have suffered no injury-in-fact related to the various election rules.

As to the Observation Rule, Plaintiffs do not intend to intentionally observe whom someone is voting for.  *See, e.g.*, Doc. 120 at 32; Doc. 131 at 63.  They instead fear being prosecuted just for entering polling places or even walking past polling place windows.  *See, e.g.*, Doc. 104 at 134–35; Doc. 129 at 51.  But the statute does not prohibit that, there is no evidence those kinds of prosecutions have ever happened, *e.g.*, Doc. 123-3 at 10, and it is no more than an "imaginary or speculative" fear that it ever would, *Younger v. Harris*, 401 U.S. 37, 42 (1971).

As to the Tally Rules, Plaintiffs claim a fear of being prosecuted for "thinking."  Doc. 104 at 140.  This is more "imaginary or speculative" fear.  *Younger*, 401 U.S. at 42.  Nobody

18

has ever been prosecuted under the Tally Rules, *see* Doc. 135 at 20; Doc. 131 at 61, much less for thinking. Plaintiffs irrationally "fear that [Defendants] will enforce [the Tally Rules] arbitrarily," but that is "too speculative an injury to confer standing." *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1381–82 (11th Cir. 2019).

As to the Communication Rule, Plaintiffs do not challenge any prohibition on communicating vote tallies before polls close. Doc. 104 at 138. They instead fear being prosecuted for things like talking about machine malfunctions and mishandled ballots. *Id.* But the statute prohibits communications about "about any ballot, vote, or selection," O.C.G.A. § 21-2-386(2)(B)(vii), so Plaintiffs are claiming a fear of being prosecuted under the most unlikely of statutory readings. That is not a basis for a pre-enforcement challenge. *See, e.g.*, *Club Madonna, Inc.*, 924 F.3d at 1382. And there's no evidence of anyone being prosecuted under this rule, much less for the things Plaintiffs are worried about.

As to the Photography Rule, Plaintiffs speculatively claim they might be prosecuted for recordings that just happen to capture ballots in the distant background. But that again is just an "imaginary or speculative" fear with no support. *Younger*, 401 U.S. at 42. Plaintiffs also seem to claim a right to photograph the

19

face of voted ballots—but they haven't claimed an intent to do that in the future, much less any likelihood of action against them by any Defendant.

**II.B.** Plaintiffs also cannot show traceability or redressability. Plaintiffs have built their entire complaint and case on the idea that SB 202 criminalizes behavior and that they are injured by the "threat of criminal prosecution." *See, e.g.*, Doc. 104 at 67, 72, 92. But Defendants are not responsible for criminal enforcement of the challenged election rules. So traceability is "lacking [because] the plaintiff would have been injured in precisely the same way without the defendant's alleged misconduct." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023) (quotation omitted). Similarly, enjoining Defendants' enforcement of the election rules would do nothing to redress injuries related to exposure to criminal prosecution.

Plaintiffs try to swap out injuries and suggest the threat of civil enforcement is what they're concerned about. Opening.Br.29. But that's too little too late. The record doesn't support that new theory at all, probably because Plaintiffs' complaint didn't actually claim it. Regardless, "even on summary judgment," this Court is "bound by the contents of the plaintiff's pleadings" when "making the necessary preliminary determination of *what claims the*

*plaintiff has actually raised* (and therefore, what claims he must have standing to raise)." *Walters*, 60 F.4th at 652 (quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 977–80 (11th Cir. 2005)). Plaintiffs' overtime substitution is not permitted.

**III.** Finally, for all the same reasons, none of the Organizational Plaintiffs have standing. Their members do not "face present harm or a certainly impending threat of" enforcement and any diversion-of-resources theory cannot be based on "inflicting harm on itself to address its members' fears of hypothetical future harm that is not certainly impending." *City of S. Miami v. Governor*, 65 F.4th 631, 637–38 (11th Cir. 2023) (quotation omitted).

## ARGUMENT

Plaintiffs' claims range from meritless to bordering on frivolous, but the antecedent problem is they don't have standing to assert any of them. Plaintiffs must prove standing for each claim they assert. *See, e.g.*, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). That means they "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *City of S. Miami*, 65 F.4th at 636 (quotation omitted). Plaintiffs bear the burden of proving each of those requirements "with the

21

manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  At the summary judgment stage that means "the plaintiff must set forth by affidavit or other evidence specific facts showing he was injured, by the defendant's legal violation, in a manner amenable to judicial relief."  *Walters*, 60 F.4th at 647 (quotation and ellipsis omitted).

Plaintiffs do not challenge any law that has ever been enforced against them; indeed, several provisions they challenge have never been enforced against anyone.  Because they assert a pre-enforcement challenge, to prove standing Plaintiffs must show, as to each of their counts, "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and "a credible threat of prosecution," which means that "the threat of future enforcement … is substantial."  *Driehaus,* 573 U.S. at 159, 164 (quotation omitted).  Additionally, because "plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are certainly impending," *City of S. Miami*, 65 F.4th at 636 (quotation omitted), and not reliant on "a highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410.

22

Plaintiffs lack standing for all their claims. The Suspension Rule is not a fit for their pre-enforcement challenge, and no Plaintiff is injured by it anyway. For the remaining rules, Plaintiffs have not suffered an injury-in-fact caused by the rules, nor can they show that any injury is traceable to Defendants or redressed by enjoining Defendants. Finally, the Organizational Plaintiffs lack standing for the same reasons.

## I.    No Plaintiff has standing to challenge the Suspension Rule.

Plaintiffs' pre-enforcement challenge to the Suspension Rule does not fit into the framework for pre-enforcement challenges, which alone is reason to reject it. Setting that problem aside, Plaintiffs have not proven an intention to commit multiple unremedied election law violations or engage in any other conduct that may result in suspension—and that conduct would not be even arguably constitutionally protected, anyway. Independently, Plaintiffs also lack standing because it is utterly speculative any of them will be suspended (or subject to any proceedings at all) under the Suspension Rule.

### A. The Suspension Rule is not subject to a pre-enforcement challenge.

As an initial matter, the Suspension Rule is categorically ill-fitted to a pre-enforcement challenge. Pre-enforcement standing (when it applies at all) is a "middle road" solution to a dilemma: people are not forced to either sacrifice their rights or face prosecution for constitutionally protected conduct. *Bankshot Billiards, Inc.,* 634 F.3d at 1350. As the Supreme Court has put it, pre-enforcement challenges allow a "hapless plaintiff" to avoid the "Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." *Steffel v. Thompson*, 415 U.S. 452, 462 (1974).

The point is that the plaintiff wants to *do something* that is arguably *constitutionally protected*, but he risks a penalty if he does. "It is thus the plaintiff's desire to engage in constitutionally protected conduct that excepts him from the choice of either violating or complying with the" challenged law. *Bankshot Billiards, Inc.*, 634 F.3d at 1350. Indeed, the decision Plaintiffs call the "leading case on pre-enforcement challenges," Opening.Br.15, was premised entirely on the plaintiffs wanting to engage in allegedly protected speech that the challenged statute proscribed, *see Driehaus*, 573 U.S. at 161–62. That's why the first

24

requirement the Court recited in *Driehaus* is that a plaintiff must intend to "engage in a course of conduct arguably affected with a constitutional interest." *Id.* at 159 (quotation omitted).

That doctrine and test are not applicable to the Suspension Rule. The rule does not proscribe any conduct, much less any arguably constitutionally protected conduct. At most, the Suspension Rule establishes *potential* consequences for election officials who violate election laws without remedying the violations or who severely mismanage elections. But it does not independently proscribe that conduct. Nor do Plaintiffs challenge any proscription on that conduct. That is not the stuff of a pre-enforcement challenge.

Plaintiffs' procedural due process claim underscores another problem. Without any actual application of the rule against Plaintiffs, there is not any process (or lack thereof) to review. This Court has noted the "inherent contradiction" of a pre-enforcement as-applied challenge, stating that there are "few situations" where it could even be "possible to bring an as-applied challenge in a pre-enforcement review of a statute that has yet to be applied." *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1255 n.20. It could work only if "the factual context of the challenge is so clear and uncontroverted that there is no question as to how the statute will

be applied" and the complaint includes "all of the factual allegations necessary to clearly illustrate the context in which the statute will be applied." *Id.*

Plaintiffs flunk that test. Their complaint asserts purported procedural deficiencies detached from any actual proceedings. *See* Doc. 104 at 120–22. It alleges generically that the Suspension Rule does not provide "notice and hearing prior to the removal" of an official and that it does not provide "any postdeprivation remedy for obtaining reinstatement" after removal. *Id.* at 120–21. But the Suspension Rule plainly requires both notice and a hearing, plus a path to reinstatement, plus judicial review. O.C.G.A. § 21-2-33.2(b)–(c), (f). The complaint alleges the Constitution requires Plaintiffs to receive public hearings, written findings, and judicial review. Doc. 104 at 122. But the Suspension Rule generally does provide for those things, *see* O.C.G.A. § 21-2-33.2(d), (f); *see also* O.C.G.A. § 21-2-106(b), and regardless, there is no basis for concluding definitively that Plaintiffs would not receive them. The complaint alleges Plaintiffs may not have counsel at hearings because the Suspension Rule bars counties from paying for it. Doc. 104 at 121. But the rule allows insurance to cover attorney's fees and litigation expenses, O.C.G.A. § 21-2-33.2(g), and there is no reason for concluding

26

Plaintiffs could not otherwise find representation—as they have for this litigation, in which the Board Member Plaintiffs are not paying for counsel, *see* Doc. 118 at 34–35; Doc. 121 at 36.

To be clear, these are not merits issues (although Plaintiffs do sell short the process provided by the Suspension Rule). The point instead is that the "factual context of" Plaintiffs' challenge is not "so clear and uncontroverted that there is no question as to how the statute will be applied" to them. *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1255 n.20. Take the issue of notice, for example. The statute states that the Board may suspend a superintendent only "after notice and hearing." O.C.G.A. § 21-2-33.2(c). Plaintiffs have argued that the statute does not actually require notice because it does not "describe the notice." Doc. 134 at 21. That reading is incoherent, but the more important point at this stage is that the very debate over whether notice will or will not be given proves that a pre-enforcement challenge is premature. In short, Plaintiffs are challenging the adequacy of a process while everyone is—at best—unsure what the process actually is or how it would actually happen in a real case.

And on top of everything else, the General Assembly has tasked the Board with promulgating "rules and regulations for conducting such preliminary investigation and preliminary

hearing." O.C.G.A § 21-2-33.2(b). Those rules have not been issued yet, which affirms that whatever process Plaintiffs want to challenge as inadequate has not even been fully established.

### B. Plaintiffs do not intend to engage in constitutionally protected conduct that is arguably proscribed by the Suspension Rule.

There are other, independently dispositive problems with Plaintiffs' theory of standing. Recall that a superintendent can be suspended only for repeated and unremedied election law violations or for severe and sustained election mismanagement. O.C.G.A. § 21-2-33.2(c). Even stretching the statute to say it "proscribes" that conduct, Plaintiffs have proven neither "an intention to engage in" it, nor that it is "arguably affected with a constitutional interest." *Driehaus*, 573 U.S. at 159 (quotation omitted).

Plaintiffs don't argue, and the evidence does not suggest, that they intend to do anything that would trigger the Suspension Rule. Plaintiffs may be concerned that it will be enforced against them out of "pettiness," Doc. 121 at 44–45, or that the Suspension Rule will be triggered merely for "irritating someone," *id.* at 32, but they are not "seriously interested in disobeying" the rule. *GeorgiaCarry.Org, Inc.*, 687 F.3d at 1252. That alone bars them

28

from satisfying the standing requirements for a pre-enforcement challenge.

But even if Plaintiffs did intend to commit election law violations (and leave them unremedied) or continually mismanage elections, that conduct is not "arguably affected with a constitutional interest." *Driehaus*, 573 U.S. at 161 (quotation omitted).  Plaintiffs have no life, liberty, or property interest in their state offices, *cf., e.g.*, *Williams v. Bd. of Regents*, 629 F.2d 993, 998 n.9 (5th Cir. 1980), much less a right to *mismanage them*. That alone is a basis for rejecting a pre-enforcement challenge.  In *Bankshot Billiards*, for example, a plaintiff who operated a pool hall and wanted to admit patrons under the age of twenty-one while also serving alcohol could not assert a pre-enforcement vagueness challenge because "that activity is not constitutionally protected," just "normal business activity."  634 F.3d at 1350. Plaintiffs here have an even weaker claim to pre-enforcement standing.  Violating election laws and mismanaging elections is not normal business activity—it's an outright failure to perform the duties of one's office.  Nobody is, or could, argue it's constitutionally protected.

Plaintiffs never actually address the first step of *Driehaus*, despite calling it the "leading case on pre-enforcement challenges."

Opening.Br.15.  At most, the Board Member Plaintiffs (but not any other Plaintiffs), broadly assert that by "being members of election board[s] subject to the [Board's] suspension authority," they "engage in the activity that places them at a threat of injury as a result of the enforcement of the laws."  Opening.Br.18.  That is like saying every citizen has pre-enforcement standing to challenge every criminal statute just because he is generally subject to the State's criminal enforcement authority.  Pre-enforcement standing requires more than merely falling under some agency's regulatory authority.

Plaintiffs try to sidestep that deficiency (albeit indirectly) by arguing that "a plaintiff who wishes to challenge the constitutionality of a law [need not] confess that he will in fact violate that law."  Opening.Br.18 (quoting *Driehaus*, 573 U.S. at 163).  That in no way eliminates the bedrock requirement that a pre-enforcement plaintiff must intend to engage in conduct "arguably proscribed" by the challenged statute.  *Driehaus*, 573 U.S. at 162 (quotation omitted).  *Driehaus* addressed a challenge to a statute that prohibited false campaign statements.  The Court was noting that the plaintiffs did not have to admit they would in fact make false statements to prove a likelihood of being

30

prosecuted, especially because they intended to repeat statements for which they had previously been prosecuted. *Id.* at 163.

That factual scenario has no application to the Suspension Rule, not least because, unlike the plaintiffs in *Driehaus*, Plaintiffs here do not plan on engaging in even arguably proscribed conduct. Plaintiffs must at the very least prove an intention to engage in conduct that might be perceived as an election law violation or mismanagement, even if they could ultimately vindicate their conduct as being neither. They have not done so. And to reiterate: even if they had done so, they still could not show that the conduct is arguably constitutionally protected. Either way, standing is foreclosed.

## C. The possibility of the Suspension Rule being enforced against Plaintiffs is utterly speculative.

Without any intention to engage in conduct arguably proscribed by the Suspension Rule, Plaintiffs run into another reason they lack standing: no future injury is "certainly impending." *City of S. Miami*, 65 F.4th at 636 (quotation omitted). Plaintiffs cannot prove standing based "on their highly speculative fear" that a statute will be enforced against them. *Clapper*, 568 U.S. at 410. They certainly cannot prove standing when that fear "relies on a highly attenuated chain of possibilities." *Id.* Indeed,

31

"the injury must … be substantially likely to actually occur," posing "a realistic danger" and not a "merely hypothetical or conjectural" one. *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1233 (11th Cir. 2019). The injury must also be "immediate," which "requires that the anticipated injury occur within some fixed period of time in the future." *Id.* (quotation omitted). Plaintiffs fail on all fronts.

**1.** The Suspension Rule gives—and Plaintiffs challenge—the Board's ability to suspend local election officials. But *any* suspension is entirely reliant "on a highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. Even the mere initiation of Suspension Rule proceedings against any Plaintiff is highly speculative. *See id.*

The initiation of suspension proceedings is restricted to a limited number of actors based on a limited number of reasons. Suspension is available only for two narrow reasons, *see* O.C.G.A. § 21-2-33.2(c)(1)–(2), which makes enforcement "constrained by explicit guidelines," *Driehaus*, 573 U.S. at 164. And not just anyone can invoke the Suspension Rule. The Board may do it or the "governing authority of a county or municipality" may do it "following a recommendation based on an investigation by a performance review board." O.C.G.A. § 21-2-33.2(a). And the

prerequisite performance review board investigation can itself begin only upon request of a narrow set of actors (who are elected officials), O.C.G.A. § 21-2-106(a), and again only for purposes of investigating suspected election mismanagement, *id.* § 21-2-106(b); *id.* § 21-2-107(a).

Even if the Suspension Rule is invoked, there are many steps before any initial and temporary suspension can happen, and then even more steps before removal. The Board must conduct a preliminary investigation, then hold a preliminary hearing. O.C.G.A. § 21-2-33.2(b). After that hearing the Board may temporarily suspend a local election official, but only if three members find multiple *unremedied* election law violations or severe and sustained election mismanagement. *Id.* § 21-2-33.2(c). The suspended official can then petition for reinstatement, for which the Board must provide a hearing, and after that the Board's decision is judicially reviewable. *Id.* § 21-2-33.2(f).

Any one of those many steps independently undermine Plaintiffs' claim of a "certainly impending" injury. *Clapper*, 568 U.S. at 402. The combination of them makes the claim untenable. No suspension can happen until multiple elected or state officials agree to start proceedings, then findings, then a hearing, and then more findings. And no permanent removal can happen until after

33

the reinstatement process and judicial review.  And that is without even mentioning that suspension is discretionary, temporary, and can happen for only one of two narrow reasons, both of which require some discretion in determining whether violations have been sufficiently remedied or whether conduct is, for example, grossly negligent.  All of that is the exact kind of "highly attenuated chain of possibilities" that precludes pre-enforcement standing.  *Clapper*, 568 U.S. at 410.[2]

Plaintiffs have not presented any evidence of a likelihood they will be suspended.  The only evidence suggests the opposite: the Board has no past or ongoing Suspension Rule proceedings against any Plaintiffs (or anyone else), it has no future plans for them, and nobody has ever been suspended under the Suspension Rule.  Doc. 123-2 at 3.  Not a single Board Member Plaintiff has even heard of the rule being applied to anyone else.  *See* Doc. 121 at 45–46; Doc. 119 at 39; Doc. 118 at 40–41.  The closest the

---

[2] Plaintiffs add yet another—and truly outlandish—layer of speculation by claiming the Board may remove local election officials without replacing them such that there will be literally nobody to count absentee votes.  Doc. 104 at 129.  Plaintiffs don't even try to defend their standing to assert that fantastical claim.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014) (issues not argued in opening brief are abandoned).

Suspension Rule has come to being invoked was when General Assembly members requested a performance review board investigation of Fulton County, which is not a party. But that investigation did not result in a petition to the Board to begin suspension proceedings. Plaintiffs themselves have conceded that "the Suspension Rule processes have never been invoked." Doc. 135 at 18. The lack of evidence means Plaintiffs have failed to carry their burden. *See, e.g.*, *Walters*, 60 F.4th at 647.

Plaintiffs' own complaint undermines their standing. It alleges that certain Board Member Plaintiffs are members of county election boards that have been investigated in the past or committed past election law violations, which they alleged "expose[d]" them "to immediate suspension or removal." *See, e.g.*, Doc. 104 at 64. We are now four years on from the conduct that Plaintiffs claimed would subject them to "immediate suspension or removal." *See, e.g.*, Doc. 1 at 70. Yet nothing has happened. That disproves the notion of imminent injury.

Moreover, the Suspension Rule can be invoked only by either the Board or the "governing authority of a county or municipality." O.C.G.A. § 21-2-33.2(a). Because the Supreme Court has disfavored "standing theories that require guesswork as to how independent decisionmakers will exercise their judgment,"

35

*Clapper*, 568 U.S. at 413, Plaintiffs can base their standing only on the possibility that the Board will initiate proceedings on its own motion.  But it is rank speculation that the Board would do so, especially because it never has and has no plans to.  *See* Doc. 123-3 at 3.  The risk of enforcement "is lower when enforcement is 'restricted to state officials who are constrained by explicit guidelines or ethical obligations.'"  *Nat'l Shooting Sports Found.*, 80 F.4th at 221 (quoting *Driehaus*, 573 U.S. at 164).  That's precisely true of the Suspension Rule.

Plaintiffs face yet another problem: *O'Shea v. Littleton*, 414 U.S. 488 (1974).  The plaintiffs there challenged a local government's criminal bond, trial, and sentencing practices.  *Id.* at 491–92.  None of the plaintiffs were "serving an allegedly illegal sentence or were on trial or awaiting trial."  *Id.* at 496.  Their standing instead was based on "the prospect of future injury," which rested "on the likelihood that [they] will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing."  *Id.*  But "attempting to anticipate whether and when" a plaintiff would "be charged with crime" and made to appear before the defendants was an "area of speculation and conjecture."  *Id.* at 497.  The Court instead had to "assume" that the plaintiffs would "conduct

their activities within the law and so avoid prosecution and conviction as well as exposure to the" conduct they challenged.  *Id.* And the plaintiffs were not claiming "any constitutional right to engage in conduct proscribed by therefore presumably permissible state laws," so the chance of them facing the injury they claimed was "simply too remote."  *Id.* at 498.

Plaintiffs' situation is highly reminiscent of *Littleton*.  As there, Plaintiffs are challenging procedures that can come up only after they initially engage in some misconduct.  But they do not claim "any constitutional right to engage in conduct" that would bring about Suspension Rule proceedings.  *Id.*  And "attempting to anticipate whether and when" Plaintiffs will violate election laws or mismanage elections is "an area of speculation and conjecture." *Id.* at 497.  In fact, Plaintiffs must be assumed to "conduct their activities within the law and so avoid … exposure to the" Suspension Rule.  *Id.*  They lack pre-enforcement standing.

**2.** Plaintiffs' primary strategy on appeal is to attempt to recharacterize their injury.  They argue that their injury is not removal, but the mere "*initiation* of suspension proceedings." Opening.Br.17.  Plaintiffs are apparently referring to the initial preliminary hearing because they have disclaimed any challenge to the separate statute authorizing performance review board

investigations.  *See id.*; Doc. 135 at 17–18.  Plaintiffs' attempted recharacterization of their injury is improper, but even their recharacterized injury is too speculative to support standing.

The main problem is that Plaintiffs' newfound injury flies in the face of their legal claims.  Opening.Br.17.  They are not claiming the procedures for *initiating* proceedings are unlawful, they are saying the *suspensions* are unlawful.  Generally, "when making the necessary preliminary determination of *what claims the plaintiff has actually raised* (and therefore, what claims he must have standing to raise), [courts] are bound by the contents of the plaintiff's pleadings, even on summary judgment."  *Walters*, 60 F.4th at 652 (quotation omitted).  Plaintiffs' claims cannot be squared with whatever purported injury comes with the mere initiation of suspension proceedings.

Consider Plaintiffs' procedural due process claim.  They claim the Suspension Rule does not give them enough process before they are deprived of their alleged constitutionally protected interest in being local election officials.  Doc. 104 at 120–21.  The only "deprivation" that could possibly be at issue is their "removal" from office, as their complaint (and common sense) make plain. *Id.*  There cannot be a *due process* problem with initiating the *process*.

Plaintiffs' other two claims challenging the Suspension Rule are that it violates the Georgia Constitution by giving the Board the power to remove local election officials, and that it burdens the right to vote because it could result in vacancies in local election official positions. *See* Doc. 104 at 123–28. Those claims make no sense unless the injury is suspension (or removal) itself. That dooms their standing because a "plaintiff who has been subject to injurious conduct of one kind does not possess by virtue of that injury the necessary stake in litigating conduct of another kind." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1286 (11th Cir. 2001) (quotation omitted and alteration adopted).

But even if Plaintiffs could repackage their claims, it wouldn't resolve the fundamental problem: it is wholly speculative that there will be *any* proceeding against any Plaintiff. Plaintiffs cannot allege their way to standing at this stage, *see, e.g.*, *Walters*, 60 F.4th at 647, and they do not cite any record evidence about the likelihood of enforcement. That alone is fatal because "appellate judges are not like pigs, hunting for truffles buried in briefs," *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (quotation omitted), and the Court should not "try to connect the dots for" Plaintiffs, *Nat'l Shooting Sports Found.*, 80 F.4th at 219. But it's unsurprising Plaintiffs cite no evidence

39

because there is none.  They just think the Board might enforce the rule out of "pettiness."  Doc. 121 at 44.  But that is the exact kind of speculative fear insufficient to establish pre-enforcement standing.  *See, e.g.*, *Clapper*, 568 U.S. at 410; *Club Madonna, Inc.*, 924 F.3d at 1381–82.

Plaintiffs cobble together certain "factors" that they say go toward the credibility of the threat of enforcement (or the likelihood of it), Opening.Br.17–22, but none actually help them. Plaintiffs argue that the Board has not disavowed enforcement of the Suspension Rule.  *Id.* at 18–19.  Under that reasoning, anybody could challenge any statute so long as the State had not somehow disavowed it.

Plaintiffs also argue that the past enforcement of the Suspension Rule against Fulton County "culminated in a negotiated settlement, but easily could have led to the suspension of the entire board."  Opening.Br.20 (citing Doc. 123-3).  It's unclear what "settlement" Plaintiffs are talking about; they provide no pincite and the document they cite discusses a settlement that *predated* SB 202.  *See* Doc. 123-3 at 16.  Either way, the argument that the Fulton County investigation "could have led to the suspension" of officials contradicts Plaintiffs' own position that suspension is not the injury.  Opening.Br.20.  And

40

more to the point, "past occurrences of unlawful conduct do not establish standing to enjoin the threat of future unlawful conduct." *City of S. Miami*, 65 F.4th at 637. And to be clear, what Plaintiffs say "could have" happened *in fact did not happen*.

Plaintiffs also attempt to equate the Suspension Rule with the statute challenged in *Driehaus*, Opening.Br.22, but that is risible. The statute challenged in *Driehaus* had been enforced in the past against the same plaintiffs for the same conduct. 573 U.S. at 164. Plaintiffs fall so short of that benchmark it just highlights their own error.

Plaintiffs contend the Suspension Rule is similar to the statute in *Driehaus* because it allows proceedings to "be initiated by any number of individual or political organizations," Opening.Br.22, but that is an obvious misrepresentation of the statute's plain text. The statute challenged in *Driehaus* allowed "any person" to file a complaint, which opened the door to political activists manipulating the statute to target opponents. 573 U.S. at 164. As already explained, the Suspension Rule has layers of restrictions on both who can invoke it and why. *See supra* at 7, 35–36. It is "restricted to state officials who are constrained by explicit guidelines or ethical obligations"—exactly what the

Supreme Court said *reduces* the likelihood of enforcement. *Driehaus*, 573 U.S. at 164.

Plaintiffs also argue that they can be suspended for what they call "[r]elatively minor violations of Georgia's election laws." Opening.Br.19. Those so-called "minor violations" include, for example, failing to monitor voting stations for unauthorized materials and allowing equipment storage rooms to reach too high a humidity. *Id.* at 20. Based on that, Plaintiffs argue the Suspension Rule is comparable to a statute allowing law enforcement officers to detain individuals and investigate their immigration status upon "an officer's finding of probable cause for *any violation of state or federal law.*" *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1259 (11th Cir. 2012).

That comparison stretches into absurdity. The likelihood of an officer observing someone violate *any law in existence* just a single time is in no way comparable to the likelihood that Plaintiffs—the people specifically tasked with implementing and sworn to implement election laws—will *repeatedly* violate those very laws *and* fail to "sufficiently remed[y]" the violations. O.C.G.A. § 21-2-33.2(c)(1). Even if Plaintiffs were to insist that they are thoroughly incapable of carrying out their duties, the simple and most important deficiency in their argument remains:

42

it is completely speculative that anyone would petition the Board to suspend any Plaintiff based on things like the maintenance of humidity levels.  Plus, not that it is necessary, but Plaintiffs have not alleged or proven that they will fail to maintain proper humidity levels.

Plaintiffs lastly argue the Suspension Rule allows for suspending the entire county board of elections, including individual members who did nothing wrong.  Opening.Br.19.  That does nothing to prove Plaintiffs' standing.  They still have to prove that they are on a county election board where suspension is in fact substantially likely to happen and imminent.  The argument is ultimately nothing more or less than all the others: "a 'perhaps' or 'maybe' chance that the [Suspension Rule] will be enforced against these plaintiffs in the future," which "is not enough to give them standing."  *Bowen*, 233 F.3d at 1340.

Plaintiffs lack standing to challenge the Suspension Rule, and the Court should affirm.

43

## II. No Plaintiff has standing to challenge the various election rules.

### A. Plaintiffs' speculative fears of unlikely prosecution do not establish an injury.

As explained, pre-enforcement standing requires "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "the threat of future enforcement … is substantial." *Driehaus,* 573 U.S. at 159, 164 (quotation omitted).  Standing cannot be based on Plaintiffs' "highly speculative fear" that a statute will be enforced against them.  *Clapper*, 568 U.S. at 410.  Additionally, although standing does not turn on the merits, this Court will sometimes "peek" at the merits to assess standing.  *See, e.g.*, *Corbett*, 930 F.3d at 1232–33; *Club Madonna, Inc.*, 924 F.3d at 1381.  When, for example, a party claims a fear of prosecution under a reading of the statute that is clearly wrong, there is no pre-enforcement standing.  *See Club Madonna, Inc.*, 924 F.3d at 1382.  That makes sense—there cannot be a credible threat of prosecution, or a substantial likelihood of it, for conduct a statute does not even arguably cover.

Plaintiffs' pre-enforcement challenges to the election rules are largely premised on outlandish interpretations of the rules.  Their general approach is to start with an extreme interpretation of the

statutory text and then claim a fear that they will be prosecuted under that unlikely interpretation—in some instances without ever claiming they even plan to engage in the proscribed conduct at all.  Nothing about this works.[3]

### 1.  Observation Rule.

The Observation Rule makes it a felony to "intentionally observe" who someone is voting for.  O.C.G.A. § 21-2-568.1(a). Plaintiffs raise three claims against the Rule, arguing it violates the right to vote, is void for vagueness, and is unlawful voter intimidation.  *See supra* at 12–13.  Those claims are all based on the notion that, because voting machines have large screens, someone, somewhere, sometime may prosecute Plaintiffs just for "mere entry into a polling place" or "even approaching a polling place with large windows."  Doc. 104 at 129–30.  Those unfounded notions are the exact kind of "highly speculative fear" that cannot open the door on a pre-enforcement challenge.  *Clapper*, 568 U.S. at 410.

---

[3] The district court relied on traceability and redressability, but this Court may affirm for any reason supported by the record. *See, e.g.*, *PDVSA US Litig. Tr. v. LukOil Pan Americas LLC*, 65 F.4th 556, 562 (11th Cir. 2023).

The Observation Rule criminalizes only "intentionally" observing who someone is voting for—it does not criminalize anything else. There's nothing vague about it, and no potential for it to criminalize entering a polling place or walking by a window. That is a basis for rejecting pre-enforcement standing. *See Club Madonna, Inc.*, 924 F.3d at 1382 (no standing when "the challenged provisions are [not] 'at least arguably vague' as applied to the" plaintiff).

Additionally, Plaintiffs do not plan to intentionally observe who someone is voting for, *see* Doc. 120 at 31 ("I have no intention to observe how another voter votes."), so they do not claim an intention to engage in arguably proscribed conduct, *see Driehaus*, 573 U.S. at 162. That means they are claiming a fear of being *wrongfully* prosecuted. But that is wildly speculative, there is no evidence of it having happened, and there is no evidence that it would ever happen. The only evidence is the opposite: nobody has been prosecuted for errant glances or walking past windows, Doc. 123-3 at 10, and Plaintiffs have not heard of it happening, *see* Doc. 118 at 48; Doc. 130 at 79; Doc. 131 at 50–51; Doc. 132 at 27. At the very most, Plaintiffs argue that because Defendants have investigated allegations of misconduct in the past—predating SB 202 and having nothing to do with its provisions—it might in the

future use SB 202 to allege "Elector Observation felonies, on an arbitrary and capricious basis."  Opening.Br.31 (quoting Doc. 15-3 at 5).  Never mind that Defendants are not responsible for criminal prosecutions, Plaintiffs' argument boils down to exactly what this Court has rejected: they "fear that [Defendants] will enforce [the Observation Rule] arbitrarily," but that "is too speculative an injury to confer standing."  *Club Madonna, Inc.*, 924 F.3d at 1381–82.

Plaintiffs who have "no fears of state prosecution except those that are imaginary or speculative[] are not to be accepted." *Younger*, 401 U.S. at 42.

## 2.    Tally Rules.

The Tally Rules prohibit the people who observe the early scanning of absentee ballots from tallying the ballots.  O.C.G.A. § 21-2-386(a)(2)(A), (B)(vi).  Plaintiffs claim the rules are void for vagueness because they criminalize merely thinking about tallying votes and that they violate the First Amendment "[i]f and to the extent" they "criminalize[] the overt acts of recording or communicating tallies."  Doc. 104 at 140, 146.  Plaintiffs do not have standing for either claim.

As to the vagueness claim: there is "nothing arguably vague about" it "as applied" to Plaintiffs, which is a basis for rejecting

standing. *Club Madonna, Inc.*, 924 F.3d at 1383. Even assuming the rule criminalizes *thinking* (and standing issues aside, everyone, the Court included, can recognize the absurdity of that argument), that does not make it *vague*; if anything, Plaintiffs' position that the statute has a clear meaning shows it's *not* vague.

And again, it is not enough to merely claim a "fear that [Defendants] will enforce [the Tally Rules] arbitrarily," because that is "too speculative an injury to confer standing." *Club Madonna, Inc.*, 924 F.3d at 1381–82. It is purely speculative to say anyone is going to be prosecuted for *thinking*. The Tally Rules have not yet been enforced, *see* Doc. 135 at 20, even though multiple poll watchers have observed post-SB 202 elections, Doc. 129 at 50, 65; Doc. 131 at 61. There is no basis for leaping to the wildest possible application of the law. These are just more "imaginary" and "speculative" fears that don't support standing. *Younger*, 401 U.S. at 42.

Plaintiffs also lack standing for their purported First Amendment claim regarding the Tally Rules. It is true that Georgia law prohibits communicating vote tallies before polls close. But that is proscribed by a different statutory provision, *see* O.C.G.A. § 21-2-386(a)(2)(B)(vii), and Plaintiffs have expressly said they do *not* challenge any proscription on communicating vote

48

tallies before the polls close.  Doc. 104 at 138; Doc. 135 at 20; *see also* Doc. 131 at 38 ("[Y]ou are not supposed to try to guess how the tally is going, which again, I would never do.").  Plaintiffs have thus disclaimed an intention to engage in the arguably proscribed conduct and have abandoned the claim that the proscribed conduct is constitutionally protected.  To the extent Plaintiffs rely on some other interpretation of the Tally Rules, they run into their consistent problem: There is no evidence they will imminently be prosecuted under outlandish statutory interpretations.

### 3.    Communication Rule.

The Communication Rule prohibits people who observe the early processing of absentee ballots from communicating any information they see "about any ballot, vote, or selection to anyone other" than election officials.  O.C.G.A. § 21-2-386(a)(2)(B)(vii).  Plaintiffs claim the rule violates the First Amendment by prohibiting more than just communications about vote tallies and "tally estimates and trends."  Doc. 104 at 138.  Their premise is that the rule extends to information about "scanning machine malfunctions, unsecured ballots, mishandling of ballots, or improperly rejected ballots."  *Id.*  But again, they expressly do not

49

challenge any prohibition on communicating about vote tallies.
Doc. 104 at 138.

The problem with Plaintiffs' claim is that it (again) relies on
reading the statute in an outlandishly broad fashion.  The
proscription is only on communicating information "about any
ballot, vote, or selection."  O.C.G.A. § 21-2-386(a)(2)(B)(vii).
Especially when read in context, that language is plainly about
the *content* of ballots and does not extend to things such as
machine malfunctions or mishandled ballots.  That minimal
interpretive question is not an off-limits merits issue when it
reveals standing deficiencies.  *See Club Madonna, Inc.*, 924 F.3d
at 1382.

Another way to think of it is by reference to the likelihood of
prosecution.  The more expansive and atextual a reading of the
statute, the less likely it is that purported violators will be
prosecuted at all.  That's exactly the problem Plaintiffs face.  They
must prove an imminent and substantial likelihood that they will
be prosecuted for the things they're worried about.  *See Corbett*,
930 F.3d at 1236.  But there's no evidence anyone plans to
prosecute them for something like talking about machine
malfunctions or mishandled ballots (neither of which are even
about the ballots themselves).  It is just more speculation.  Indeed,

despite poll watchers being at numerous elections since SB 202, nobody has been prosecuted for what Plaintiffs fear the Communication Rule prohibits. *See* Doc. 128 at 26–27; Doc. 129 at 65; Doc. 131 at 60; Doc. 132 at 42. Plaintiffs lack standing to assert a pre-enforcement challenge.

### 4.  Photography Rule.

The Photography Rule prohibits people from recording ballots while they are being voted or after they have been voted. O.C.G.A. § 21-2-568.2. Plaintiffs claim the rule is void for vagueness and that it violates the First Amendment because photographing election officials counting ballots and voters in the act of voting is protected expression. Doc. 104 at 141–44.

Plaintiffs have no pre-enforcement standing to assert the vagueness claim because they have not presented any actual theory of vagueness or explained how it affects them. Their complaint alleges that photographing ballots should be unlawful only when it reveals who cast the vote. *See* Doc. 104 at 143. But that's not a vagueness issue. *See Club Madonna, Inc.*, 924 F.3d at 1382–83 (standing to assert vagueness claim lacking when there is no actual issue of vagueness). Plaintiffs also allege that the Photography Rule could prohibit video interviews of poll officials in the polling place or surveillance video of polling places. Doc.

51

104 at 143. Again, those aren't vagueness issues, but more to the point, Plaintiffs run into the same problem as their other claims: The notion that anyone will be prosecuted under the Photography Rule for these types of videos or interviews is speculative. Nor is it at all clear that Plaintiffs are even able to conduct surveillance videos or interviews inside polling places, as an unchallenged statute predating SB 202 generally prohibits that. *See* O.C.G.A. § 21-2-413(e).

As for the First Amendment challenge, all the usual problems bar Plaintiffs' pre-enforcement standing. Generally, Plaintiffs' complaint does not even seem to claim any right to photograph actual voted ballots, referring instead to photographing election officials counting ballots and "voters in the act of voting." Doc. 104 at 141; *see also Walters*, 60 F.4th at 652 (determining a plaintiff's claims is based on "the contents of the plaintiff's pleadings") (quotation omitted). But even if they did claim they have a First Amendment right to photograph the face of voted ballots, Plaintiffs have not carried their burden of proving an intention to engage in that conduct. At most, Marilyn Marks, who is the Executive Director of Coalition for Good Governance, testified in a Rule 30(b)(6) deposition that in May 2022 she was told she would be arrested if she took pictures of certain areas in a polling place

and of ballots. Doc. 130 at 79–81. But that incident involved DeKalb and Fulton County poll workers, not any Defendant; Marks did not know of that happening to any Plaintiff; and she did not claim any intention to engage in the conduct in the future. *Id.* And Marks is not actually a Plaintiff in this case. Someone who is a Plaintiff, Rhonda Jo Martin, testified that she doesn't plan to take pictures so the Photography Rule "doesn't affect" her or even "really bother" her. Doc. 131 at 40. It is Plaintiffs' burden to show an intention to imminently engage in the proscribed conduct, and to show it with evidence. *See, e.g.*, *Walters*, 60 F.4th at 647. They have fallen well short.

**B.  Plaintiffs cannot show traceability or redressability.**

Traceability requires that Plaintiffs' "injuries be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Walters*, 60 F.4th at 650 (quotation omitted). Traceability is "lacking if the plaintiff would have been injured in precisely the same way without the defendant's alleged misconduct," *id.* (quotation omitted), and "a plaintiff lacks standing to challenge a rule if an independent source would have caused him to suffer the same injury," *Swann v. Sec'y, Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012).

53

Redressability requires a plaintiff to "show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) (quotation omitted). Traceability and redressability often "travel together." *Id.* They do here, but Plaintiffs cannot hitch a ride with either.[4]

1. Plaintiffs' entire complaint, and all of their claims, are based explicitly on challenging *criminal* penalties. There is no ambiguity about that. *See, e.g.*, Doc. 104 at 9, 12, 13, 22, 23, 36, 48, 49, 67, 70, 77, 78, 83, 92, 96, 98, 102, 104, 134–35, 137–38, 140–42, 146 (relying on criminalization and criminal law standards). And the "threat of criminal prosecution" is Plaintiffs' express claimed injury and basis for standing. *See id.* at 83; *see also id.* at 67, 70, 75, 77–78, 92, 96, 98–99, 102, 104. That is a problem for Plaintiffs because they have not sued anyone responsible for the criminal enforcement of laws. District attorneys, and in a more limited fashion the Attorney General, do that, not these Defendants. *See generally* O.C.G.A. §§ 45-15-3(3),

---

[4] Plaintiffs have not appealed the district court's ruling that they cannot establish traceability or redressability as to the Governor. Opening.Br 12. Additionally, Plaintiffs' arguments address only the Board, so they have forfeited their claims against the Secretary. *See, e.g.*, *Sapuppo*, 739 F.3d at 683.

21-2-31(5), 16-15-4(n), 15-18-6.  That defeats both traceability and redressability because even if Defendants were enjoined, "other state actors"—district attorneys—"would remain free … to engage in the conduct that the plaintiffs say injures them:" potential criminal enforcement of SB 202.  *Support Working Animals, Inc.*, 8 F.4th at 1205.

**2.** Plaintiffs do not argue otherwise.  They instead again try to recharacterize their entire case and injury.  According to Plaintiffs, their injuries are traceable to the Board and redressable by an injunction against it because the Board has *civil* enforcement authority of the election rules.  Opening.Br.29–30.

Standing turns on the connection "between the injury and the conduct complained of" in the complaint.  *Bochese*, 405 F.3d at 980.  So, for example, where a plaintiff sought to rely on an agency theory to establish traceability, he could do so only because this Court first found his complaint had allegations about agency.  *Walters*, 60 F.4th at 652.  Similarly, where a plaintiff argued that he lost a particular profit, this Court carefully parsed his complaint to see what specific conduct he alleged caused the loss.  *See Bochese*, 405 F.3d at 977–80.  Although there were multiple ordinances and actions the plaintiff might have based his injury on, his complaint had challenged only one specific act of rescission.

55

*Id.* at 978. His injury, accordingly, could be based on only that rescission. *Id.* at 980.

Plaintiffs' entire complaint is about challenging SB 202's *criminalization* of certain behavior and their allegations about injury are about criminal prosecution. *See, e.g.*, *supra* at 54; Doc. 104 at 67 ("Plaintiff Shirley … is threatened with imminent injury" because entering polling places "will expose Plaintiff Shirley to felony prosecution"); *id.* at 93 ("The threat of criminal prosecution will impair" the plaintiff); *see also id.* at 9 ("Senate Bill 202 burdens [speech] with the specter of criminal prosecution."). The conduct Plaintiffs' complaint complains of is the potential criminal enforcement of the various election rules. That is what Plaintiffs' standing must be "measur[ed] … against." *Bochese*, 405 F.3d at 985.

Civil and criminal enforcement are distinct things carrying separate considerations, concerns, burdens, rules, and processes. Standards of vagueness, for example, differ when "civil rather than criminal penalties" are at issue. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). Civil enforcement might be *an* injury a plaintiff *could* seek to prevent. But it's not the one these Plaintiffs complained of. *See Walters*, 60 F.4th at 652; *Bochese*, 405 F.3d at 980.

56

Even if Plaintiffs could swap out their injury, it would not save them from their traceability and redressability problems. Plaintiffs state that the Board "is empowered to issue cease and desist orders, levy fines, issue reprimands and to refer complaints to the Attorney General [or] district attorneys for civil or criminal prosecution," Opening.Br.29–30, but the only action they devote any argument to (or point to any evidence of) is its ability to refer cases to district attorneys or the Attorney General, *id.* at 29–32. But that referral theory just shifts them into the sort of general supervisory or enforcement authority theory the district court rejected as to the Governor. *See* Doc. 162 at 22. The mere ability to refer cases to someone else is even less of a supervisory or enforcement authority than what this Court in *City of South Miami* held was insufficient for traceability and redressability. There, the defendants could actually suspend officials, *City of S. Miami*, 65 F.4th at 642, which is a greater power than merely referring cases to some other official.

Even Plaintiffs' brief cannot escape that what they really rely on is the potential for criminal charges. As to Plaintiff Dufort, for example, Plaintiffs abandon all pretense and rely on her testimony that she fears being charged with a misdemeanor or felony. Opening.Br.32. Elsewhere they rely on concerns about

57

being charged with "crimes" and "felonies." *Id.* at 31.  Plaintiffs cannot bait-and-switch their way into standing when they never actually commit to the switch.

Finally, Plaintiffs trot out the misguided notion that the district court's ruling "would require plaintiffs challenging a state law to sue every state official capable of enforcing the law." Opening.Br.24.  But a pre-enforcement plaintiff suing to enjoin criminal enforcement of a law need only sue the criminal prosecutor who will enforce the law against *him*.  That means the district attorney in the county where he plans to commit the crime, not every district attorney everywhere.  *See Matsumoto v. Labrador*, 122 F.4th 787, 822 (9th Cir. 2024) (Bea, J., dissenting). There is no need to manufacture complexities when a simple answer exists.  Regardless, even if suing all district attorneys were required to satisfy traceability and redressability requirements, that is not a reason to circumvent standing.  *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1258 (11th Cir. 2020) (traceability and redressability required suing all 67 county-level Supervisors of Elections because claimed injury was based on statewide harm).

## III. There is no organizational standing.

For all of the reasons already discussed, the Organizational Plaintiffs all lack standing. They cannot claim standing based on their members' alleged injuries because they "have not established that their members face present harm or a certainly impending threat of" enforcement. *City of S. Miami*, 65 F.4th at 637 (quotation omitted). And although "an organization can establish standing under a diversion-of-resources theory, it cannot do so by inflicting harm on itself to address its members' fears of hypothetical future harm that is not certainly impending." *Id.* at 638 (quotation omitted). An "organization can no more spend its way into standing based on speculative fears of future harm than an individual can." *Id.* at 639 (quotation omitted); *see also Corbett*, 930 F.3d at 1239. In any event, all of the traceability and redressability problems independently undermine the Organizational Plaintiffs' standing.

## CONCLUSION

For the reasons set out above, this Court should affirm the judgment of the district court.

59

Respectfully submitted.


|  | /s/ *Elijah J. O'Kelley* |
|---|---|
| Bryan P. Tyson | Christopher M. Carr |
| Bryan F. Jacoutot | *Attorney General of Georgia* |
| Diane F. LaRoss | Stephen J. Petrany |
| *Special Asst. Attys. General* | *Solicitor General* |
|  | Elijah J. O'Kelley |
|  | *Deputy Solicitor General* |

Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
 *Special Asst. Attys. General*

/s/ *Elijah J. O'Kelley*
Christopher M. Carr
 *Attorney General of Georgia*
Stephen J. Petrany
 *Solicitor General*
Elijah J. O'Kelley
 *Deputy Solicitor General*

Clark Hill PLC
3630 Peachtree Rd. NE
Suite 550
Atlanta, GA 30326
(678) 370-4377
btyson@clarkhill.com

Office of the Georgia
 Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for Defendant-Appellees*

60

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,091 words as counted by the word-processing system used to prepare the document.

/s/ *Elijah J. O'Kelley*
Elijah J. O'Kelley

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2025, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Elijah J. O'Kelley*
Elijah J. O'Kelley